IN THE UNITED STATES DISTRICT COURT
<u>FOR THE DISTRICT OF MARYLAND</u>
**Southern Division**

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2017 JUN 12 P 4: 44

CLERK'S OFFICE
AT GREENBELT

BY_____

|  |  |  |
|---|---|---|
| **NADINE GODBOLT,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Case No.: GJH-14-3546** |
| | * | |
| **TRINITY PROTECTION** | * | |
| **SERVICES, INC.** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*\*

<u>**MEMORANDUM OPINION**</u>

Plaintiff Nadine Godbolt brings claims against her former employer, Defendant Trinity

Protection Services, Inc. ("Trinity"), for discrimination on the basis of sex in violation of Title

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and discrimination

on the basis of a disability in violation of the Americans with Disabilities Act Amendments Act

of 2008 ("ADAAA"), 42 U.S.C. § 12101 *et seq.* ECF No. 27. Defendant's Motion for Summary

Judgment, ECF No. 48, came before the Court for a hearing on May 22, 2017. Loc. R. 105.6 (D.

Md. 2016). For the reasons that follow, Defendant's Motion for Summary Judgment is granted.

**I.    BACKGROUND**

Godbolt was employed by Trinity, a security services contracting corporation, as a

Contract Security Officer ("CSO") from July 30, 2011, until her termination on July 18, 2012.

ECF No. 48-6 at 1; ECF No. 48-15 at 1.[1] During that time period, Trinity provided security

services to the government and private entities. ECF No. 48-2 ¶ 4.

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated
by that system.

Godbolt was hired to staff a contract that Trinity had received from the Department of Defense ("DOD") to provide security services at various government buildings. *Id.* ¶ 11; *see also* ECF No. 48-6 at 1. The DOD contract required that security personnel meet certain physical requirements, adhere to specific standards of conduct, and follow a dress code. *Id.* ¶ 13; *see also* ECF No. 48-5. Godbolt's offer letter stated that she would be paid on an hourly basis and that her "work duties, work location, shift and post assignment and supervisor are...subject to change at [Trinity's] discretion." ECF No. 48-6 at 1. She signed the letter, indicating acceptance of an assignment at "One Liberty Center." *Id.* at 2.

Godbolt states that she requested various schedule changes from her supervisor, Sabrina Currie, such as picking-up additional hours, trading shifts with other employees and changing to a new shift, but was denied. ECF No. 48-10 at 9; ECF No. 51-2. Godbolt states that on at least three occasions, the shift she requested was then given to a male employee. ECF No. 51-2 at 2. Similarly, Godbolt states that male employees were allowed to trade shifts while she was not. ECF No. 51-7.

During her deposition, Godbolt provided additional details regarding the timing of these events. She stated that around August 1, 2011 she requested to pick-up additional hours that were available because other workers did not show up or called in sick. ECF No. 48-10 at 4. Godbolt stated that she made a second request "days after" the first request, *id.* at 5, and a third request, a week or two later. *Id.* at 6. Godbolt stated that all the requests "happened within a three-week span." *Id.*[2]

---

[2] In an affidavit submitted with her Response in Opposition to Defendant's Motion for Summary Judgment, Godbolt now states that she requested to pick up available shifts on several dates between September 23, 2011 and October 12, 2011. ECF No. 51-1 ¶ 17. However, a plaintiff cannot contradict their deposition testimony and, thus, create a dispute of fact in the face of a summary judgment motion through their own self-serving affidavit. *See Zimmerman v. Novartis Pharm. Corp.*, 287 F.R.D. 357, 361 (D. Md. 2012) ("Under the sham affidavit doctrine, 'a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn

With respect to her requests to trade shifts, Godbolt stated in her deposition that the first time she and another officer sought to trade shifts occurred during the second week of August 2011. ECF No. 48-10 at 10. In a letter written to Trinity's Human Resources Department on September 26, 2011, Godbolt stated that on September 23, 2011, she asked Currie to clarify whether or not she would allow Godbolt and another officer to trade shifts, and Currie stated that she would not approve the switch. ECF No. 51-2 at 4.

Finally, with respect to changing to a new shift, Godbolt stated that a new shift became available in early September. ECF No. 48-10 at 8. Godbolt does not specify in her affidavit or deposition when she requested this new shift for herself. However, the fact that she did not receive this new shift, and that it was instead given to other officers, is mentioned in her September 26, 2011 letter to Trinity. ECF No. 51-2 at 3.

On September 23, 2011, an incident occurred between Godbolt and Currie after their discussion regarding Godbolt's request to trade shifts with another officer. ECF No. 48-8; ECF No. 51-1 ¶ 14. Although both parties describe a hostile exchange, they differ over their interpretation of the events, with Godbolt stating that Currie was the instigator and Trinity claiming the reverse. *Id.* Currie wrote a report of the incident and recommended that Godbolt be terminated for insubordination. ECF No. 48-8. In a letter dated September 26, 2011, Godbolt provided her version of the incident and detailed the discriminatory treatment she felt she had suffered while working under Currie, including Currie's denial of her requested schedule changes. ECF No. 51-2.

---

deposition) without explaining the contradiction or attempting to resolve the disparity.'") (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)). Thus, the Court will not consider these new, contradictory, assertions, which appear to have been made to prevent these claims from being time-barred.

On October 6, 2011, Godbolt was instructed by the Director of Human Resources to report to work as scheduled. ECF No. 48-9; ECF No. 51-1 ¶¶ 22-23. However, upon her arrival, Currie did not permit Godbolt to work. *Id.* Godbolt refused to leave as requested, and this incident, along with the prior September 23, 2011 incident, was referred to Trinity's Human Resources Department for further action. ECF No. 48-2 ¶ 23.

On October 10, 2011, Trinity's Director of Human Resources issued a letter resolving the prior incidents by transferring Godbolt from One Liberty Center to National Center, effective October 12, 2011. ECF No. 48-9 at 2. Shortly after Godbolt's transfer, one of the three buildings that composed National Center was shut down due to the government downsizing its operations. ECF No. 55-1 ¶ 7. As a result, Godbolt's schedule was reassigned. *Id.* ¶ 10. Godbolt alleges that Trinity removed her from her new post to accommodate a male officer whose post had closed. ECF No. 27 ¶ 17. Trinity agrees that Godbolt was replaced by a male employee, but states that they were required to do so because they were bound by a collective bargaining agreement, which stated that Trinity must reassign senior officers to new positions at Trinity's remaining facilities if their post closes. ECF No. 55-2 ¶ 9. Trinity states that Godbolt was a junior officer, and that her schedule was reassigned to a senior officer who happened to be male. *Id.* ¶ 10. As of December 3, 2011, Godbolt was placed on an on-call/part-time status until a new site opened because no other positions were available. *Id.* ¶ 11. Godbolt states that she was left with "no work hours and no income." ECF No. 51-1 ¶ 29.

In March 2012, Godbolt was placed at another location in Rosslyn, Virginia, where she remained until her termination. ECF No. 48-2 ¶ 27. At this new location, Godbolt was supervised by Miriam Haigler, an African-American female. *Id.*; *see also* ECF No. 51-1 ¶ 30. During her

time at this new post, Godbolt was cited for additional disciplinary infractions, the last of which led to her termination. ECF No. 48-2 ¶¶ 28-31.

On May 1, 2012, Trinity's government client wrote to Trinity, stating that Godbolt had violated the DOD contract by taking a "rover log" home,[3] wearing an improper uniform and failing to cooperate in an investigation into an anonymous call about suspicious activity at the site. *Id.* ¶ 28; *see also* ECF No. 48-11. Godbolt wrote to Trinity's Program Manager, admitting that she had taken the rover log home, but stating that she had done so accidentally. ECF No. 48-12. Godbolt now asserts that she was forced to write that letter. ECF No. 51-1 ¶ 32.

Trinity also states that Godbolt arrived to work late on May 1, 2012, and falsified her timesheet to state that she arrived earlier than she actually did. ECF No. 48-2 ¶ 29.[4] Godbolt disputes this, saying that a supervisor ordered two other officers to change their time cards to make it look like she arrived late. ECF No. 51-1 ¶¶ 40-44. In support of her argument, Godbolt attaches a statement from Officer Bryant stating that he was instructed by his supervisor to sign out at 8:05 am to "show that CSO Godbolt was late." ECF No. 51-11. She also submits an email of a text message, where Officer Bryant again states that his supervisor made him sign out at 8:05 am. ECF No. 51-12. Notably, neither Godbolt's affidavit nor the statements of the other officers affirmatively state that she arrived on time that day and, thus, do not contradict Trinity's statement.

Trinity's Human Resources Department investigated Godbolt's tardiness and her removal of the rover log, and issued a letter to Godbolt on May 9, 2012, detailing their conclusions. ECF No. 48-13. In the letter, Trinity's Director of Human Resources stated that their investigation

---

[3] During oral argument, counsel for Trinity explained that a "rover log" is a paper document that logged the activities of officers who were assigned to move around the facilities.
[4] Godbolt also references an incident on March 23, 2012, where she states that her supervisors changed her time card without her consent. ECF No. 51-1 ¶¶ 37-39. Presumably, Plaintiff contends that this demonstrates that she worked more hours than she was credited for.

revealed that Godbolt willfully committed both infractions, which violated both Trinity's contract with DOD and Trinity's Employee Handbook. *Id.* Trinity stated that Godbolt would be reprimanded instead of terminated for these infractions, but cautioned that "[a]ny future infractions of the same or another nature will result in your immediate termination." *Id.* As a consequence of these infractions, Godbolt was suspended from work for five days and was placed on a 90-day probationary period. *Id.* Godbolt states that this suspension was without pay. ECF No. 51-1 at ¶ 32.

Godbolt claims that this punishment was discriminatory since a male officer, Officer Oduro, was not punished when he failed to turn in a rover log. *Id.* Ostensibly in support of this claim, Godbolt submits a statement from Officer Oduro, explaining that a sergeant told him to complete a different form instead of the rover log. ECF No. 51-8. Godbolt also submits a statement from Officer Lynch, who says that he was "not aware of any other [CSO] being formally disciplined, suspended or terminated due to a failure to prepare or update a 'Roving Officer Log.'" ECF No. 51-14. Finally, a statement by Officer Kidwell, also allegedly in support of this proposition, generally refers to the "unjust & excess corrective action singling out Godbolt," without reference to any specific act. ECF No. 51-13.

The final incident which led to Godbolt's termination occurred on July 9, 2012. That morning, Officer Beasley, an employee of the government client, observed Godbolt with her hat on the back of her gun belt rather than on her head. ECF No. 48-14. The officer informed Godbolt that she was required to wear her hat while on duty, and Godbolt responded by stating, "I am hot and I am getting a paper towel to wipe my head." *Id.* Ten minutes later, the officer observed Godbolt again without her hat on. *Id.* The officer informed Godbolt's supervisor, Miriam Haigler, of the incident, and Haigler instructed Godbolt to put on her hat. *Id.* The officer

stated that Godbolt then placed the hat on her head "in a position not consistent with wearing a baseball style hat" before removing the hat completely. *Id.*

Godbolt states she was experiencing an asthma attack during this period, and had requested to take off her hat to increase her air flow. ECF No. 27 ¶ 24. Godbolt further states that Haigler was aware of her condition and initially "made a semblance of recognition of [her] need for medical attention" by offering her bottles of cold water. *Id.* In her deposition, Godbolt admitted that that she had never experienced a similar episode before. ECF No. 48-10 at 11.

On July 11, 2012, Godbolt filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging in relevant part, discrimination based on sex and disability. ECF No. 51-7. With respect to her sex discrimination claim, Godbolt stated that preferential schedules were given to male officers; male officers were allowed to trade shifts; after her site closed, she was put on an on-call list and a male officer was given her schedule; and she was suspended for five days. *Id.* She also describes the July 9, 2012 incident which led to her termination, stating that she had an "allergic reaction" due to working near a construction site and had told her supervisors about her "bronchitis-related condition" in June 2012. *Id.*

On July 18, 2012, Trinity mailed Godbolt a letter of termination, stating that Godbolt was being terminated for the uniform violation, dress code violation and insubordination that occurred on July 9, 2012. ECF No. 48-15. The letter also indicated that Godbolt had been warned in the May 9, 2012 letter of reprimand that any further infractions would result in her termination. *Id.* In support of their argument that Godbolt was not singled out for termination because of her sex, Trinity states that between September 2011 and September 2012 they terminated ten males for insubordination, three males for violations of the dress code and two males for falsifying their time cards. ECF No. 48-2 ¶ 37.

Plaintiff filed her initial Complaint on November 12, 2014, ECF No. 1, which she subsequently amended on August 10, 2015. ECF No. 27. The Amended Complaint contained five counts: (1) disparate treatment in violation of Title VII; (2) sex discrimination in violation of Title VII; (3) disability discrimination in violation of the ADAAA; (4) unlawful termination in violation of Virginia state policy; and (5) civil conspiracy. *Id.* On March 14, 2016, the Court issued a Memorandum Opinion and Order, granting Defendant's Motion to Strike Count II as duplicative of Count I and granting Defendant's Motion for Partial Dismissal as to Counts IV and V. *See Godbolt v. Trinity Prot. Servs., Inc.*, No. GJH-14-3546, 2016 WL 1070808 (D. Md. Mar. 14, 2016) (hereinafter "*Godbolt I*"). However, the Court denied Defendant's Motion for Partial Dismissal as to Count I. *Id.* at *4. The Court further held that any allegations supporting a Title VII violation, occurring prior to September 15, 2011, would be time barred. *Id.* at *3.

Following discovery, Defendant filed the presently pending Motion for Summary Judgment. ECF No. 48. Subsequently, Plaintiff filed her Response in Opposition, ECF No. 51, and Defendant filed their reply, ECF No. 55. On May 22, 2017, the Court heard oral argument on the motion. ECF No. 59.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir.

1987). If the moving party demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322-23. A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only genuine if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1986). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

### A. Count I: Disparate Treatment in Violation of Title VII

Count I of the Amended Complaint sets forth a claim for "Disparate Treatment in Violation of [Title VII]." Title VII makes it illegal for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's…sex…" 42 U.S.C. § 2000e-2(a)(1). The crux of a disparate treatment claim is "whether a protected characteristic of the employee motivated the employment action taken by the employer." *Barnett v. Tech. Int'l, Inc.*, 1 F. Supp. 2d 572, 577 (E.D. Va. 1998) (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

### 1. Statute of Limitations

As a threshold matter, Defendant argues that the Court need not reach the merits of Plaintiff's claims because the allegedly unlawful employment practices occurred more than 300 days before Plaintiff filed her EEOC Complaint, and thus, they are time barred. *See Godbolt I.* at *3 (discussing time limitations for Title VII claims filed in Maryland). The Court previously determined that September 15, 2011 was the relevant date for this inquiry because her EEOC Complaint was filed on July 11, 2012. *Id.* at *3. Thus, any allegations supporting a Title VII violation, occurring prior to September 15, 2011, are time barred. *Id.*

Reviewing Plaintiff's claims, it is clear that her allegations regarding her inability to pick-up additional hours occurred prior to September 15, 2011. In her deposition, she stated that she first requested to pick-up additional hours on or around August 1, 2011 and that her subsequent requests "happened within a three-week span." ECF No. 48-10 at 4-6. Thus, these allegations cannot support a Title VII claim.

On the other hand, the Court finds that Plaintiff's claims regarding her inability to trade shifts with other officers, the denial of her request to switch to a new shift, her removal from her post at National Center in favor of a male employee, and her suspension without pay, are not time barred. Turning first to the allegations regarding trading shifts, Defendant cites a portion of the deposition testimony where Plaintiff stated that the *first* time she sought to trade shifts with Officer Quansah was during the second week of August 2011, to support their argument that this allegation is time barred. ECF No. 48-10 at 10. However, the record demonstrates that this request, or a subsequent one, was denied by Plaintiff's supervisor, Sabrina Currie, on September 23, 2011. ECF No. 48-8 ("On Friday September 23, 2011….I stated to [O]fficer Godbolt and Officer Quansah that there will be no switching of shift."). As the denial of the request, rather

than the initiation, is the allegedly adverse action, the Court finds that this claim is not time barred.

Defendant also argues that Godbolt's allegations that she was denied an opportunity to switch to a new shift are time barred. However, again, Godbolt's deposition testimony does not prove their case. In the portion they cite, Godbolt states only that a shift she was interested in became available in early September, not that she requested and was denied that shift in early September. ECF No. 48-10 at 8. The record also includes a letter from Godbolt to Trinity's Human Resources Department, written on September 26, 2011, stating that Currie had denied Godbolt's request to switch to a new shift. ECF No. 51-2 at 3. Therefore, the record demonstrates that the denial occurred sometime between early September and September 26, 2011. Drawing all justifiable inferences in the favor of the non-movant, the Court finds that this claim is not time-barred. Finally, Godbolt's claims that she was removed from her position at National Center in November 2012 to accommodate a male employee and that she was more severely punished than a male colleague for taking home a rover log in May 2012 are clearly within the relevant time window, and thus, are not time barred.[5]

In conclusion, the Court finds that Godbolt's claims, with the exception of her allegations regarding picking up additional, available hours, are not time-barred, and will now determine whether or not Plaintiff has submitted sufficient evidence regarding these allegations to state a *prima facie* claim of disparate treatment.

---

[5] Trinity argues that Godbolt's claim that she was improperly removed from her position at National Center to accommodate a male employee is not properly before the Court because it was not referenced in Count 1 of the Amended Complaint. ECF No. 55 at 13 n.8. However, this allegation was included in the fact section of Godbolt's Amended Complaint, which Godbolt incorporated into Count 1.

## 2. Plaintiff's *Prima Facie* Case of Disparate Treatment

"A plaintiff generally may defeat summary judgment and establish a claim for [sex] discrimination [under Title VII] through two avenues of proof." *Holland v. Washington Homes, Inc.,* 487 F. 3d 208, 213 (4th Cir. 2007). One avenue is for the plaintiff to demonstrate "through direct or circumstantial evidence that [sex] was a motivating factor in the employer's adverse employment action." *Id.* (citing *Hill v. Lockheed Marlin Logistics Mgmt., Inc.,* 354 F. 3d 277, 284 (4th Cir. 2004) (en banc)). Because Plaintiff has proffered no evidence of "conduct or statements that both reflect directly on [an] alleged discriminatory attitude" towards women, "and that bear directly on the contested employment decision," *Gott v. Town of Chesapeake Beach, Md.*, 44 F. Supp. 3d 610, 615 (D. Md. 2014) (citation omitted) (discussing standard in the context of an ADEA claim), Plaintiff must proceed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under this approach, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *See McDonnell Douglas*, 411 U.S. at 802; *see also Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996). If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802. The plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are but a pretext for discrimination, thus creating an inference that the defendant acted with discriminatory intent. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143 (2000). Importantly, "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Evans*, 80 F.3d at 959.

In order to establish a *prima facie* claim of discrimination under Title VII, a plaintiff must demonstrate: "(1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals,* 626 F.3d 187, 190 (4th Cir. 2010).[6]

Defendant concedes that as a woman, Plaintiff is a member of a protected class and, thus, she can establish the first element of her *prima facie* case. However, Defendant argues that Plaintiff cannot establish the three remaining elements. Plaintiff's claim ultimately fails because of her inability to establish element two, satisfactory job performance. However, for the sake of completeness, the Court will first briefly address the other elements of Plaintiff's *prima facie* case before analyzing Plaintiff's job performance.

In order to succeed on an employment discrimination claim, a plaintiff must plausibly demonstrate an adverse employment action. "'An adverse employment action is a discriminatory act that adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Blakes v. City of Hyattsville,* 909 F. Supp. 2d 431, 436 (D. Md. 2012) (quoting *Thorn v. Sebelius,* 766 F. Supp. 2d 585, 598 (D. Md. 2011)). "Typically, an adverse employment action has been found in cases of discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Ruffin v. Lew*, No. PWG-11-2469, 2014 WL 4854972, at *8 (D. Md. Sept. 29, 2014) (citation omitted). "Although conduct short of ultimate employment decisions can constitute adverse employment action, there still must be a tangible effect on the terms and conditions of employment." *Geist v. Gill/Kardash P'ship,* 671 F. Supp. 2d 729, 737 n. 6 (D. Md. 2009) (citation and quotation omitted).

---

[6] As explained in more detail below, Plaintiff must establish a different final element for one of the adverse employment actions.

Here, Godbolt states that she suffered the following adverse employment actions: (1) denial of request to pick up available hours; (2) denial of request to trade shifts with other officers; (3) denial of request to change to a new shift, (4) removal from her post at National Center and (5) five days of suspension without pay.[7] As discussed above, her statements that her requests to pick up available hours were denied are time barred. Her next two claims, denials of her requests to trade shifts with other officers and to switch her shift to one of her preference, do not constitute adverse employment actions because Godbolt has not demonstrated that these actions led to a tangible effect on the terms and conditions of employment such as loss of pay or a missed promotion opportunity. *See Cepada v. Bd. of Educ. of Baltimore Cty.*, 814 F. Supp. 2d 500, 510 (D. Md. 2011) (denial of promised reduced teaching schedule and assignment to less favorable teaching schedules were not adverse actions "[because plaintiff] did not allege a loss of pay, benefits, job title, or responsibility."). It is only those personnel decisions that have a "tangible effect on the terms and conditions of employment" that amount to an adverse employment action. *Geist*, 671 F. Supp. 2d at 737 n. 6 (citation and quotation omitted). Thus, personnel decisions that result in a "mere inconvenience" do not constitute an adverse employment action, unless that inconvenience causes a significant change in employment status. *See Nichols v. Comcast Cablevision of Maryland*, 84 F. Supp. 2d 642, 659 (D. Md. 2000) ("[a] mere inconvenience without a significant change in employment status is insufficient").

However, Plaintiff's removal from her position at National Center, leaving her without regular work or pay for approximately three months, while she was placed on an on-call/part-time status, constitutes a significant change in employment status. Additionally, because Godbolt states her five-day suspension, although brief, was unpaid, ECF No. 51-1 at ¶ 32, this also

---

[7] Defendant does not appear to challenge the assertion that the unpaid suspension was an adverse employment action. Instead, Defendant only discusses whether or not Godbolt could demonstrate that similarly situated male employees were treated differently. ECF No. 48-1 at 23.

constitutes a significant change in benefits. *See Ellis v. Kanawha Cty. Pub. Library*, No. 2:15-CV-05698, 2016 WL 5387648, at *5 n.3 (S.D.W. Va. Sept. 26, 2016) (conditions of a suspension, including whether or not plaintiff alleged that it had an effect on their pay or otherwise caused economic harm, affect whether or not a suspension is considered an adverse employment action).

Having determined that two of Godbolt's claims, her removal from her position at National Center and her unpaid suspension, constitute adverse employment actions, the Court turns to the fourth element of Godbolt's *prima facie* case.

With respect to her five-day suspension, Godbolt argues that she was treated differently from Officer Oduro, a male officer, who was not punished when he failed to turn in a rover log. To establish this element of her claim, Godbolt "must demonstrate that the comparator was 'similarly situated' in all relevant respects." *Sawyers v. United Parcel Serv.*, 946 F. Supp. 2d 432, 442 (D. Md. 2013) *aff'd*, 576 F. App'x 199 (4th Cir. 2014). "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (quoting *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992)); *see also Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) ("[T]he purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision making personnel...") *aff'd*, 553 U.S. 442 (2008).

Godbolt does not provide the Court with sufficient facts to conclude that Officer Oduro, the male officer who was not punished for a rover log infraction, was similarly situated to her.

First, they were accused of different misconduct; she took home a rover log, whereas Officer Oduro failed to complete a rover log. The statements that Godbolt submits only discuss situations where an officer failed to complete a rover log and do not discuss what difference, if any, there would be between the two infractions. For example, Officer Oduro discusses his confusion regarding whether or not he was required to complete a rover log. ECF No. 51-8. This suggests that completing a rover log might not be a requirement at all and, thus, a failure to do so would not be a serious infraction. Similarly, Officer Lynch states that he was not aware of any other individual being suspended for failing to prepare or update a rover log, but does not indicate if other employees had committed Godbolt's infraction, taking home a rover log, and not received punishment. ECF No. 51-14. Even assuming that the conduct at issue was substantially similar, Plaintiff does not provide any evidence that she shared a similar performance history with Officer Oduro. It is reasonable, and not indicative of discrimination, that an officer such as Godbolt, with a history of disciplinary infractions, may receive a harsher punishment than another officer for whom this might be their first offense. Thus, the Court finds that Godbolt has not provided sufficient evidence for the Court to conclude Officer Oduro was similarly situated to her and, thus, any difference in Trinity's treatment of Officer Oduro does not support Godbolt's *prima facie* case. Furthermore, to the extent that Godbolt's suspension was also based on the fact that she allegedly falsified her time card, Trinity submitted evidence that they terminated two male employees for falsifying their time card during the relevant period. ECF No. 48-2 ¶ 37. Therefore, a brief suspension, when an employee could have been terminated for the offense, is not indicative of discrimination.

Finally, although the parties discuss Godbolt's removal from her position at National Center in the same context as the adverse actions that were meted out as punishment for

disciplinary infractions, the Court finds that this incident was different. Here, Godbolt was not removed as a punishment for her conduct; rather, she states that Trinity removed her from her post to accommodate a male officer whose post had closed. ECF No. 27 ¶ 17. Thus, the Court finds that this is more analogous to a discriminatory termination, albeit a temporary one. This distinction is important because it requires Plaintiff to establish a slightly different set of elements. Although the other elements of her claim are the same, to establish that she was terminated because of her protected status, Plaintiff must demonstrate as the final element that "the position remained open or was filled by similarly qualified applicants outside the protected class." *Holland,* 487 F.3d at 214 (citing *McDonnell Douglas*, 411 U.S. at 802).

Here, Godbolt does not provide *any* information regarding the male officer that replaced her at the National Center site. Thus, the Court cannot conclude that they were similarly qualified. In fact, Trinity has submitted evidence that demonstrates they were not similarly qualified in at least one key aspect – Godbolt was a junior officer whereas her replacement was a senior officer. ECF No. 55-1 ¶ 10. As Trinity explained, they had a legitimate, non-discriminatory reason for their action because Trinity was bound by an agreement with the security officer's union to replace all junior employees with senior employees when a senior employee's facility closed down. ECF No. 55-1 at ¶ 9. Thus, Godbolt, a junior employee was replaced by a senior employee, who happened to be an African American male. *Id.* ¶ 10. Further, Godbolt has not submitted any evidence to demonstrate that this decision was pre-textual.

Lastly, as discussed above, where Plaintiff's case fails most clearly is in her inability to establish the second element, satisfactory job performance. Because Trinity's proffered non-discriminatory reason for terminating Godbolt was poor work performance, the Court will consider these issues together. *See Davis v. Nissan N. Am., Inc.*, No. GJH-14-3166, 2016 WL

4059346, at *7 (D. Md. July 27, 2016) *aff'd*, 2017 U.S. App. LEXIS 10205 (4th Cir. 2017) (citing *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 515-16 (4th Cir. 2006) (noting the flexibility of the *McDonnell Douglas* framework and finding "no impermeable barrier that prevents the employer's use of such evidence [of an employee's unsatisfactory work performance] at different stages of the *McDonnell Douglas* framework.")).

To demonstrate satisfactory job performance at summary judgment, an employee must "demonstrate that he was generally satisfying his employer's relevant, objective performance standards at the time of his termination." *Brown v. Siemens Healthcare Diagnostics, Inc.*, No. DKC-11-0769, 2012 WL 3136457, at *7 (D. Md. July 31, 2012) (citing *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 766 & n.1 (4th Cir. 2003)). "'[A] plaintiff need not show perfect performance or even average performance to satisfy this element. He need only show that his performance was of sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge him…'" *Id.* (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978)). A plaintiff can meet their burden of proving pretext "either by showing that [the employer's] explanation [for their termination] is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of…discrimination." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (internal citation omitted).

Plaintiff has failed to provide affirmative evidence that she was performing her job satisfactorily. Instead, Plaintiff seeks to shift the burden to Trinity, arguing that they have not submitted an independent job evaluation that demonstrates that Godbolt was underperforming. ECF No. 51 at 21. However, the law does not require this of Trinity. The burden is on Plaintiff to

demonstrate that her "performance was of sufficient quality to merit continued employment." *Brown,* 2012 WL 3136457, at *7. She has not done so.

In contrast, Trinity has submitted evidence that Godbolt, despite several warnings, continuously failed to meet Trinity's performance standards. The first two incidents on September 23, 2011 and October 6, 2011, regarding Godbolt's "unprofessional," "unbecoming" and "insubordinate[]" interactions with her supervisor Currie, resulted in Godbolt's transfer to a new location. ECF No. 48-9. Once at her new post, with a new supervisor, Godbolt continued to receive disciplinary infractions. In May 2012, Trinity was notified by their government client that Godbolt had committed several infractions, including taking home a rover log. ECF No. 48-11. That same month, Trinity stated that Godbolt arrived late to work and falsified her timesheet to state that she arrived earlier than she actually did. ECF No. 48-2 ¶ 29. After an investigation into these incidents, Godbolt was suspended for work for five days, placed on a 90-day probationary period and cautioned that "[a]ny future infractions of the same or another nature will result in [Godbolt's] immediate termination." ECF No. 48-13. On July 9, 2012, Godbolt ignored multiple orders from the government client and her direct supervisor to wear her hat, ECF No. 48-14, and was subsequently terminated for uniform violation, dress code violation and insubordination. ECF No. 48-15.

Godbolt, however, contends that these infractions were pre-textual, stating that upper management was working "in cahoots with [her former supervisor] Currie to discriminate against me." ECF No. 51-1 ¶ 25. In order to demonstrate pretext, a plaintiff must prove *"both* that the reason was false, *and* that discrimination was the real reason" for the adverse employment action. *Adams v. Tr. of the Univ. of N.C.-Wilmington,* 640 F.3d 550, 560 (4th Cir. 2011) (emphasis in original) (citation omitted). Building a case against an underperforming employee

through "well-documented warnings and reprimands issued to the Plaintiff" does not demonstrate that the employer's actions are a pretext for discriminatory conduct. *Sellers v. Giant Cement Holding, Inc.,* No. 11-2803, 2013 WL 4436470, at \*3 (D.S.C. Aug. 14, 2013). Here, Godbolt has not pointed to any circumstantial evidence probative of discrimination. Godbolt submits affidavits from two other officers, Lynch and Kidwell, in an effort to demonstrate that Trinity's allegations with respect to the rover log incident were pre-textual. As discussed above, Lynch states that he was "not aware of any other [CSO] being formally disciplined, suspended or terminated due to a failure to prepare or update a 'Roving Officer Log,'" ECF No. 51-14, and Kidwell generally refers to the "unjust & excess corrective action singling out Godbolt," without reference to any specific act. ECF No. 51-13. At most, these statements support an inference that Godbolt *may* have been subject to more severe discipline than other officers. However, Godbolt stills fails to demonstrate that gender discrimination, rather than the individual circumstances of Godbolt's employment record or the specific infraction (i.e. the rover log being taken home instead of left unprepared) was the real reason for Trinity's decision. "[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate non-discriminatory reasons for a discharge." *Vannoy v. Fed. Reserve Bank of Richmond,* 827 F.3d 296, 305 (4th Cir. 2016) (quoting *Dockins v. Benchmark Commc'ns,* 176 F.3d 745, 749 (4th Cir. 1999)). Thus, the Court finds that Trinity is entitled to summary judgment with respect to Godbolt's claim of disparate treatment on the basis of sex.[8]

---

[8] To the extent that Plaintiff's various references to Trinity's "retaliatory" conduct are attempts to plead a Title VII retaliation claim, the Amended Complaint does not include such a claim. *See* ECF No. 27 (listing Count One as "disparate treatment in violation of 42 U.S.C. § 2000(e )(2)(a)(1)" and Count Two, dismissed in a prior opinion as duplicative of Count One, as "Sex/Gender Discrimination in Violation of Title VII of the Civil Rights Act of 1964."). Thus, such claims are not properly before the Court. *See Jeffries v. Wal-Mart Stores E., LP,* No. GJH-15-473, 2016 WL 430479, at \*4 (D. Md. Feb. 3, 2016) (quoting *Zachair Ltd. v. Driggs,* 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) ("[A] plaintiff 'cannot, through the use of motion briefs, amend the complaint.'")).

**B. Count III: Disability Discrimination in Violation of the ADAAA**

Count III of the Amended Complaint sets forth an allegation that Trinity violated the ADAAA when they terminated Godbolt after she experienced an asthma attack at work on July 9, 2012. To establish a claim for wrongful discharge under the ADAAA, Plaintiff must demonstrate that "(1) [s]he is within the ADA's protected class; (2) [s]he was discharged; (3) at the time of [her] discharge, [s]he was performing the job at a level that met [her] employer's legitimate expectations; and (4) [her] discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001).

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). As the Fourth Circuit recently noted, the "ADA Amendments Act (ADAAA) was intended to make it easier for people with disabilities to obtain protection under the ADA. The regulation clarifies that the primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015) (internal quotations and citations omitted).

Plaintiff argues that her asthma, or as she described in her EEOC Complaint, her "allergic reaction" to being posted near a construction site, which affected her "bronchitis-related condition," places her within the ADA's protected class. ECF No. 51-7. While asthma, allergies and "bronchitis-related conditions" are physical impairments that can affect an individual's major life activity of breathing, these illnesses present in varying levels of severity and Godbolt must still prove that her condition, be it asthma, allergies or bronchitis, "substantially limit[s]"

her ability to breathe. *See Jenerette v. Montgomery Cty. Gov't*, No. CIV.A. DKC 09-1777, 2010 WL 2817039, at *5 (D. Md. July 16, 2010) (finding that asthma is a physical impairment to breathing but that plaintiff failed to show that he was substantially limited in a major life activity). "An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(ii). Here, Plaintiff has failed to introduce any evidence into the record to suggest that this was more than a brief, one-time episode where she had "symptoms of excessive heat, gasping for breath and dizziness," and which she responded to by taking off her hat, drinking water to cool down, ECF No. 27 ¶ 24, and upon her arrival at home, taking Claritin, an over the counter allergy medicine. ECF No. 48-10 at 13. While Godbolt states that she requested an ambulance, *id.*, in her deposition she states that she ended up driving herself home. ECF No. 48-10 at 12. Far from a disabling impairment, Godbolt describes a scenario which many members of the general public may have experienced as an isolated occurrence. Furthermore, Godbolt does not introduce any medical evidence to support a finding that her asthma, allergies or bronchitis, present in a form that "substantially limits" a major life activity, such as breathing. The only medical records submitted by Godbolt list allergic rhinitis, commonly known as allergies or hay fever, as a medical condition, but state "today's diagnosis" as an unrelated condition. ECF No. 51-18. Thus, it is unclear to the Court if Godbolt was ever diagnosed with asthma, or another respiratory condition, or if the doctor merely noted her self-reported symptoms during a visit to discuss a separate concern. Furthermore, in her deposition, Godbolt stated that, prior to her asthma attack at work on July 9, 2012, she had never experienced a similar allergic episode. ECF No. 48-10 at 11. Because Godbolt has failed to demonstrate that her condition "substantially limits [her] ability…. to perform a major life

activity as compared to most people in the general population," 29 C.F.R. § 1630.2(j)(ii), the Court finds that Godbolt has not demonstrated that she falls within the ADA's protected class.

However, keeping in mind the Fourth Circuit's admonition that the ADAAA focuses on "whether discrimination has occurred, not whether the individual meets the definition of disability," the Court will also address the other elements of Plaintiff's case. *Jacobs*, 780 F.3d at 572.

The parties agree that Plaintiff was discharged from her employment with Trinity, thus establishing the second element of her *prima facie* case. However, as discussed above in the context of her Title VII claim, Plaintiff has failed to submit any evidence that she was performing her job at a level that met her employer's legitimate expectations. Thus, even if Plaintiff's asthma or allergies constituted a disability, her claim would still fail because she has not established the third element of the *prima facie* case.

Finally, Plaintiff has also failed to submit any evidence from which the Court could infer that her termination from the company occurred under circumstances that would raise a reasonable inference of unlawful discrimination, and thus, she also fails to establish the fourth element of her claim. In her Opposition, Godbolt argues that her termination was pre-textual, citing a discrepancy between the notice of disciplinary action, in which the supervisor that observed the incident stated that Godbolt said she felt ill, ECF No. 51-17, and the letter of termination, ECF No. 48-15, which made no mention of Godbolt feeling ill that day. However, this discrepancy does not create a reasonable inference of unlawful discrimination. "[T]he ADA does not require an employer to simply ignore an employee's blatant and persistent misconduct, even where that behavior is potentially tied to a medical condition." *Vannoy*, 827 F.3d at 305. Thus, even assuming that Godbolt's asthma attack required her to remove her hat, Trinity's

23

decision to fire Godbolt for the latest in a series of demonstrated misconduct, including uniform violations and insubordination, would not violate the ADA. *See id.* at 299, 304 (employee's misconduct, including his failure to communicate regarding unscheduled absences, was a legitimate reason to terminate him even if they were potentially related to his depression and alcoholism). Thus, the Court finds that Trinity is entitled to summary judgment with respect to Godbolt's claim of disability discrimination. [9]

## IV.    CONCLUSION

For the reasons explained above, Defendant's Motion for Summary Judgment is granted. A separate Order follows.

Dated: June 12, 2017

_____
GEORGE J. HAZEL
United States District Judge

---

[9] In the section of her Opposition addressing her ADA claim, Godbolt cites the standard for a failure to accommodate claim, and appears to argue that Trinity also violated her rights under the ADA by failing to accommodate her disability. To the extent that Godbolt seeks to assert this claim now, it is denied because she failed to exhaust her administrative remedies by not raising this claim in her EEOC Complaint. Furthermore, even if the claim was not exhausted, it would fail because Godbolt has failed to establish that she was disabled.